Harry P. Susman
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
(713) 651-9366

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
EOS Partners L.P.,                          :
EOS Partners (Offshore), L.P.,              :
                                            :
                        Plaintiffs,         :
                                            :
              -v-                           :
                                            :
Madison Dearborn Partners Inc.,             :
Madison Dearborn Partners LLC,              :
Madison Dearborn Partners III, L.P.,        :
Timothy Hurd, and                           :
Paul Wood.                                  :
                                            :
                        Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# 03C 6861

03 Civ._____

**COMPLAINT**

**JUDGE MANNING**

**MAGISTRATE JUDGE DENLOW**

        Plaintiffs EOS Partners L.P. and EOS Partners (Offshore), L.P. (collectively referred to as "EOS"), by its undersigned attorneys, for its Complaint herein, alleges upon knowledge as to itself and otherwise upon information and belief, as follows:

## Nature of the Action

        1.        This is a securities action brought by EOS, a purchaser of 11% Senior Subordinated Notes due 2006 ("Notes") issued by Outsourcing Solutions, Inc. ("OSI") on March 20, 2002, against Madison Dearborn Partners LLC, Madison Dearborn Partners Inc., Madison Dearborn Partners III, L.P., Timothy Hurd, and Paul Wood (collectively referred to as "Madison Dearborn").

2.      On March 21, 2002 (one day after EOS purchased OSI's Notes), OSI announced that it had misstated its publicly filed financial statements and would have to restate them.

3.      OSI further announced that as a consequence of the misstatement, the company defaulted under critical lending arrangements. This default subsequently led to OSI's filing for bankruptcy.

4.      OSI concealed from investors the fact that a critical lending agreement, called the Conduit Facility, had been effectively terminated as of December 2001. OSI did not reveal the truth about this agreement to EOS until during the pendency of OSI's bankruptcy, at which point OSI blamed this termination for OSI's financial collapse.

5.      Madison Dearborn exercised almost complete control over OSI. Madison Dearborn owned almost 75% of the outstanding voting common stock of OSI, and two of its managing directors, Defendants Wood and Hurd, actively participated in the day-to-day management of OSI in their capacities as both officers and directors of OSI. As a result, Madison Dearborn is liable to EOS as a "control person" of OSI.

## The Parties

6.      Plaintiff Eos Partners, L.P. is a Delaware limited partnership with its principal place of business in New York City, New York. On March 20, 2002, Eos Partners, L.P. bought $1,530,620 worth of 11% Senior Subordinated Notes due 2006 issued by Outsourcing Solutions, Inc. ("OSI"). Eos Partners, L.P. paid $1,339,292 for the Notes.

7.      Plaintiff Eos Partners (Offshore), L.P. is a Delaware limited partnership with its principal place of business in New York City, New York. Eos Partners Offshore, L.P. On March 20, 2002, Eos Partners (Offshore), L.P. bought $53,380 worth of 11% Senior Subordinated Notes

due 2006 issued by Outsourcing Solutions, Inc. ("OSI"). Eos Partners (Offshore), L.P. paid $46,707 for the Notes.

8.      Defendant Madison Dearborn Partners LLC is a limited liability corporation organized and existing under the laws of Delaware with its principal place of business located at Three First National Plaza, Suite 3800, Chicago, Illinois, 60602. Madison Dearborn Partners LLC managed and was the sole general partner of Madison Dearborn Partners III, L.P., which along with two other Madison Dearborn-controlled entities (Madison Dearborn Special Equity Fund III, L.P. and Special Advisors Fund I, LLC), owned 74.5% of the voting common stock of OSI. Madison Dearborn Partners LLC's two managing directors (Defendants Hurd and Wood) were both officers and directors of OSI and were actively involved in the day-to-day management of OSI.

9.      Defendant Madison Dearborn Partners Inc. is a corporation organized and existing under the laws of Delware with its principal place of business located at Three First National Plaza, Suite 3800, Chicago, Illinois, 60602. Madison Dearborn Partners Inc. managed Madison Dearborn Partners III, L.P., which along with two other Madison Dearborn entities (Madison Dearborn Special Equity Fund III, L.P. and Special Advisors Fund I, LLC), owned 74.5% of the voting common stock of OSI. Madison Dearborn Partners Inc.'s two managing directors (Defendants Hurd and Wood) were both officers and directors of OSI and were actively involved in the day-to-day management of OSI.

10.     Defendant Madison Dearborn Partners III, L.P. is a limited partnership organized and existing under the laws of Delaware with its principal place of business located at Three First National Plaza, Suite 3800, Chicago, Illinois, 60602. Madison Dearborn Partners III, L.P. is a $2.2. billion investment raised by Madison Dearborn Partners in 1999 and managed by Madison Dearborn

Partners. Madison Dearborn Partners III, L.P. owned 4,433,913.11 shares of the voting common stock of OSI. This represented 73% of the total voting stock of OSI.

11.     Defendant Timothy Hurd is a resident of Illinois, and may be served at his business address, Three First National Plaza, Suite 3800, Chicago, Illinois, 60602. Defendant Hurd is a managing director of Madison Dearborn Partners, and was a member of OSI's Board of Directors and served as OSI's Vice-President from 1999 to the present. Mr. Hurd was actively involved in the day-to-day management of OSI.

12.     Defendant Paul Wood is a resident of Illinois, and may be served at his business address, Three First National Plaza, Suite 3800, Chicago, Illinois, 60602. Defendant Wood is a managing director and founder of Madison Dearborn Partners, and was a member of OSI's Board of Directors and served as OSI's Vice-President from 1999 to the present. Mr. Wood was actively involved in the day-to-day management of OSI.

13.     All Defendants are collectively referred to as "Madison Dearborn Partners." All Defendants have agreed that their outside lawyer, Andrew Kassof at Kirkland & Ellis, Aon Center, 200 East Randolph Drive, Chicago, Illinois 60601-6636, will accept service of process.

## Jurisdiction and Venue

14.     This Court has personal jurisdiction over each of the Defendants because the Defendants regularly conduct business in the State of Illinois and the acts complained of herein occurred in substantial part in the State of Illinois.

15.     This Court has subject matter jurisdiction over this action pursuant to Section 27 f the Securities Exchange Act of 1934, 15 U.S.C. §78aa, and 28 U.S.C. §1331 and pursuant to 28 U.S.C. §1367.

16. Venue is proper in this District as many of the acts alleged herein occurred in substantial part in this District.

## Factual Background

17. OSI was a large provider of business process outsourcing receivable services, ranging from basic billing services to delinquent debt collection services. In May 2003, OSI sought protection under Chapter 11 of the Bankruptcy Code. OSI was run and owned by an investment fund called Madison Dearborn Partners, which purchased OSI in a leveraged buyout in 1999.

18. EOS is an investor who unknowingly invested in OSI on the eve of its revealing an accounting fraud, which subsequently led to the bankruptcy.

19. On March 20, 2002, EOS purchased $1,584,00 worth of 11% Senior Subordinated Notes due 2006 ("Notes") issued by OSI.

20. The Notes are subject to a Registration Statement filed with the Securities Exchange Commission on April 28, 1997. The Notes, however, were not traded actively at any time.

21. EOS purchased the Notes in direct reliance on the public filings made by OSI, including OSI's most recent Form 10Q, which was for the Third Quarter of 2001 and was filed on November 11, 2001, and most recent Form 10K, which was for the year ended December 31, 2000 and was filed on March 30, 2001.

22. The 10Q for the Third Quarter of 2001 reported a net loss of $5.14 million for the quarter, based on $151 million in revenues and $43.9 million in operating expenses. The 10K for 2000 reported a net loss of $19.451 million. Unbeknownst to EOS, these statements were false.

23. OSI's public filings made clear that a substantial amount of OSI's revenues were attributable to its purchasing of portfolios of charged-off receivables (such as non-performing consumer credit-card debts) which OSI then collected. In its 10-K for 2000, OSI explained that this

critical source of revenue was dependent on something called the Conduit Facility, which allowed

OSI to fund the purchase of portfolios. OSI actually purchased these portfolios of charged-off

receivables using an off-balance sheet entity called FINCO, which in turn paid fees to OSI based

on collections. OSI explained the Conduit Facility in the following manner:

> In order to fund an increased level of portfolio purchasing, in October 1998 the Company established a financing conduit, in association with MBIA Insurance Corporation. The conduit is expected to provide OSI with significantly increased purchasing capacity necessary to expand its portfolio purchasing activities at a lower aggregate cost of capital. The transaction structure involves off-balance sheet treatment for a significant portion of prospective portfolio purchases and the related financing, while providing a consistent servicing revenue stream. Although the Company places most of its portfolio purchases in the conduit, OSI will, when required, continue to place certain portfolio purchases on its balance sheet. The revenue from owned portfolios is derived from gross collections and offset by collection costs and portfolio amortizations. Conversely, the off-balance sheet accounting treatment for portfolios sold into the conduit creates service fee revenues which is a percentage of gross collections, offset by collection costs but with no portfolio amortization. In addition, from time to time, the Company may receive income from the conduit representing excess collections above the original cost to purchase the portfolio and related financing fees.

In the 10Q for the Third Quarter of 2001, OSI made clear that the Conduit Facility (which OSI also

called a "revolving warehouse facility") was working fine. OSI reported the substantial revenues

earned from this line of business, and announced that, "[a]t September 30, 2001 and December 31,

2000, FINCO had outstanding borrowings of $66,706[000] and $67,636[000] respectively, under

its revolving warehouse financing arrangement [the Conduit Facility]." Again, unbeknownst to

EOS, these statements were false and misleading because the Conduit Facility had been effectively

terminated as of December 2001.

24.    On March 21, 2002, OSI issued an 8-K, announcing that it would "be necessary for

the Company to restate its financial results for the third quarter of 2001." The restatement was

provoked by "inaccurate financial reporting of certain transactions by on of the Company's

subsidiaries, North Shore Agency, Inc." The company assured investors that it believed no other

financial statements other than the third quarter of 2001 would be impacted.

25. The 8-K filed on March 21, 2002 also announced that as a result of the restatement, "the Company believes that it is in default under its bank credit facility and its commercial paper conduit facility, which would preclude the Company from borrowing additional funds under such agreement until an amendment or waiver is obtained under each agreement." This filing was the first time that OSI hinted at any trouble with obtaining money under the Conduit Facility. However, OSI assured investors that it believed a waiver of the default would be obtained.

26. The March 21, 2002, announcement was purposefully delayed by OSI. Upon information and belief, the March 21, 2002 announcement came almost two months after OSI's outside auditors first discovered the problem. According to recent filings by the Official Committee of Unsecured Creditors in the OSI bankruptcy, "[i]n January of 2002, the Company's auditors discovered unreconciled irregularities in the financial records of North Shore Agency, Inc., an OSI subsidiary, in the course of OSI's December 31, 2001 year-end audit." (This allegation is based on discovery taken pursuant to a protective order and thus the underlying facts are not yet available to EOS for purposes of this lawsuit.) The announcement itself indicates that OSI already had extensive discussions with some of its lenders, so presumably OSI knew about the problems and had taken steps to resolve the situation long before it was announced to the investing public on March 21, 2002.

27. EOS invested on March 20, 2002, one day before the accounting problems were revealed to the public.

28. During January 2002 (at the same time, OSI's outside auditors had discovered the accounting problems), OSI was meeting with various underwriters about the possibility of conducting an initial public offering of OSI stock, which was largely owned by Madison Dearborn Partners. As well, OSI began to have discussion during this period with the NCO Group about NCO

acquiring OSI. Such an IPO or buy-out would allow Madison Dearborn Partners to cash out of its large position in OSI common stock. Upon information and belief, EOS alleges that the possibility of an IPO or buyout gave Madison Dearborn Partners a huge motive and opportunity to conceal the accounting fraud and the brewing financial disaster (as detailed below) in the hope that Madison Dearborn Partners could resolve the problems secretly and allow the IPO to proceed.

29.     On April 15, 2002, OSI filed an amended 10Q for the Third Quarter 2001. The amended 10Q revealed the restated results, including reported revenues and operating expenses: OSI's losses for the Third Quarter 2001 were increased by over 60%–from $5.14 million to $8.6 million. As well, OSI announced that contrary to it earlier statement, the fraud impacted not just one quarter but two years' worth of financial results. Thus, OSI restated the previously reported revenues and operating expenses from the 2000 10-K, revising the reported loss from $19.451 million (as originally reported) to $25.108 million.

30.     Although the amended 10Q revealed that OSI had hired a law firm to conduct an investigation into the erroneous reporting, the amended 10Q merely revealed that the investigation found an overstatement of revenues and understatement of certain payables.

31.     What OSI failed to reveal at the time was that these accounting errors were the product of intentional fraud by OSI management. During the course of its subsequent bankruptcy in mid-2003, OSI revealed in court filings that the accounting errors were part of a scheme by certain OSI executives to inflate earnings in order to increase their incentive-based compensation. OSI was created by acquiring various other companies in the receivables management business. One such company was North Shore, which OSI acquired in 1997. As part of the acquisition, OSI gave the existing management "an earn-out payment" that depended on the continuing performance of North Shore. According to OSI, "[t]he individual who apparently had been principally

responsible for the falsification of records and inaccurate financial reporting was eligible for such incentive compensation. As a result of the falsification of records and inaccurate financial reporting, the amount of earn-out and incentive compensation paid to certain of the former owners and other employees of North Shore was greater than it otherwise would have been." In its brief in support of the reorganization plan, OSI finally revealed that "[a]n independent investigation concluded that certain assets were intentionally overstated (primarily accounts receivables and prepaid postage), while trade accounts payable were intentionally understated through falsification of records and inaccurate financial reporting over a two year period."

32. In addition to the restated financials, OSI mislead investors about the Conduit Facility, the critical lending facility outlined in OSI's public filings. Although OSI noted in the 8-K filed on March 21, 2002 that OSI had defaulted under the Conduit Facility because of the restatement, OSI failed to reveal that the Conduit Facility had already been effectively terminated by the lender since December 2001. OSI had been unable for months to obtain financing under the Conduit Facility, yet OSI failed to reveal this to investors.

33. Starting in the Summer of 2001, the provider of the Conduit Facility indicated that it intended to wind down the facility even though the term of the agreement still had two years to run. After the provider agreed to honor the facility through the end of the term, the provider then began refusing to finance certain acquisitions of portfolios. This first rejection occurred in September 2001. From December 2001 through the Summer of 2002, the lender refused to finance the purchase of any additional portfolios under the Conduit Facility. As OSI itself recently admitted in its bankruptcy filings, "[b]y December 2001, OSI had effectively lost it conduit facility and was required to seek alternatives to either supplement (replace) the conduit facility or sell its Portfolio Business."

34.    Given the critical importance of these purchases to OSI's ability to generate revenue, the effective termination of the Conduit Facility inevitably would inflict terrible damage to OSI's business. Yet, OSI never revealed anything about these problems to the investing public; instead, EOS first learned about these problems after OSI sought bankruptcy protection.

35.    To the contrary, OSI noted on April 15, 2002 that the Conduit Facility lender had agreed to waive the default caused by the restatement, suggesting that any problem between the Conduit Facility lender and OSI was resolved. OSI noted, however, that it could be in default going forward under the Conduit Facility, but assured investors that it was working to amend the Conduit Facility to avoid such defaults. OSI further noted that in the event the Conduit Facility was terminated in the future, OSI would look for other funding. OSI, therefore, attempted to create the impression that as of April 2002, the Conduit Facility was available to the company to fund purchases and had not been terminated. Yet, from December 2001 forward, the Conduit Facility was closed to the company and continued to be closed until OSI sought bankruptcy.

36.    OSI's fraud and non-disclosure continued into the Fall of 2002. In the Form 10Q filed on August 13, 2002, OSI went a step further and reported that any potential problems under the Conduit Facility were resolved satisfactorily:

> The Company, FINCO and the lenders to the Warehouse Facility amended the facility effective July 8, 2002. The amendment includes provisions that amend the financial covenants and waive prior covenant defaults and any existing Wind-Down Events, as defined in the Warehouse Facility. In addition, the amendment also places certain limitations on bonus fee payments which can be paid to OSI and its affiliates.

37.    The restatement and the effective termination of the Conduit Facility created a cascade of bad events for OSI over the next few months. OSI's revenues dropped dramatically because OSI could not purchase additional portfolios. As well, in order to resolve the various defaults created by the restatement, OSI announced that it had negotiated new financial covenants

under its existing lending agreements. OSI, however, immediately found itself struggling to comply with these newly-negotiated covenants. In order comply with the covenants, OSI attempted to sell its existing portfolio purchasing business in order to pay down its debt, but after searching for a purchaser between April 2002 and July 2002, OSI failed to obtain an attractive offer. In August 2002, the Company's President and Chief Executive Officer, Timothy Beffa, resigned. Finally, in September 2002, the group of banks that provided secured financing to OSI forced the company to hire a restructuring specialist. Sometime during the Fall of 2002 (again without any public announcement), all of the outside directors on the Board of Directors resigned.

38.     The first time EOS was told about the looming financial disaster at OSI was in September or October 2002, when Paul Wood informed EOS that OSI would not be making the coupon payment on the 11% Senior Subordinated Notes due 2006 owned by EOS. OSI's public filings during 2002 gave no hint of the problems, with the exception of an 8-K that announced the resignation of Tim Beffa.

39.     In December 2002, OSI notified the Securities Exchange Commission that it would cease to make public filings.

40.     After months of unsuccessful negotiations with potential replacement financing for the Conduit Facility, OSI filed for bankruptcy protection in May 2003.

41.     These misstatements and omissions caused EOS's Notes to drop dramatically in value. The direct effect of the misstated and omitted information was to cause OSI to seek bankruptcy protection. OSI has stated to the bankruptcy court that the cause of its bankruptcy was the accounting problems and the loss of revenues in the portfolio purchasing business caused by the loss of the Conduit Facility.

42.     Depending on the re-organization plan adopted by the Bankruptcy Court, EOS's Notes may be worthless and, at a minimum, will be worth dramatically less than EOS paid for the Notes.

43.     It is clear that OSI and its management violated Section 10(b) and Rule 10(b)(5). OSI repeatedly misrepresented its financial performance and omitted critical information about the Conduit Facility. Management of OSI made the misrepresentations regarding the accounting with clear intent to defraud in order in part to increase their own compensation. Upon information and belief, OSI and management had motive and opportunity to fail to disclose the true state of the Conduit Facility because it would have destroyed any IPO or merger that would have allowed insiders to cash out of their stock holdings. To postpone this result, OSI and management simply hid the truth. At a minimum, OSI acted with reckless disregard for the truth by not revealing the situation with the Conduit Facility, especially since it was effectively terminated in December 2001. EOS relied on these misrepresentations by acquiring the Notes in the first instance–in direct reliance on OSI's public filings–and EOS continued to hold onto the Notes–again, in reliance on OSI's public filings, which never disclosed the truth state of affairs under the Conduit Facility--until it became effectively impossible to sell the Notes. OSI used the means or instrumentalities of interstate commerce to commit this violation.

## CAUSE OF ACTION

## I.

## COUNT I. (Section 20: Control Person Liability)

44. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-43.

45. Defendants acted as the controlling persons of OSI within the meaning of section 20(a) of the Exchange Act.

46. Defendant Madison Dearborn Partners LLC managed and was the sole general partner of Madison Dearborn Partners III, L.P., which along with two other Madison Dearborn entities (Madison Dearborn Special Equity Fund III, L.P. and Special Advisors Fund I, LLC), owned 74.5% of the voting common stock of OSI. Madison Dearborn Partners LLC's two managing directors (Defendants Hurd and Wood) were both officers and directors of OSI and were actively involved in the day-to-day management of OSI.

47. Defendant Dearborn Partners Inc. managed Madison Dearborn Partners III, L.P., which along with two other Madison Dearborn entities (Madison Dearborn Special Equity Fund III, L.P. and Special Advisors Fund I, LLC), owned 74.5% of the voting common stock of OSI. Madison Dearborn Partners Inc.'s two managing directors (Defendants Hurd and Wood) were both officers and directors of OSI and were actively involved in the day-to-day management of OSI.

48. Defendant Madison Dearborn Partners III, L.P. is a $2.2. billion investment raised by Madison Dearborn Partners in 1999 and managed by Madison Dearborn Partners. Madison Dearborn Partners III, L.P. owned 4,433,913.11 shares of the voting common stock of OSI. This represented 73% of the total voting stock of OSI.

49.     Defendant Timothy Hurd was a managing director of Madison Dearborn Partners, and was a member of OSI's Board of Directors and served as OSI's Vice-President from 1999 to the present.  Mr. Hurd was actively involved in the day-to-day management of OSI.

50.     Defendant Pail Wood was a managing director and founder of Madison Dearborn Partners, and was a member of OSI's Board of Directors and served as OSI's Vice-President from 1999 to the present.  Mr. Wood was actively involved in the day-to-day management of OSI.

51.     Defendants, by virtue of their stock ownership, management involvement, and position on the Board, had direct and supervisory involvement in the day-to-day operation of OSI and had the power to, and did, control or influence, the particular transactions giving rise to the securities violations of OSI.

52.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchase of Notes in OSI.  The amount of plaintiffs' damages has not been yet fully determined.

53.     Accordingly, Defendants are jointly and severally liable for securities fraud.

### Request for Jury Trial

54.     Plaintiffs make a timely demand for trial by jury of all issues so triable.

### Request for Relief

WHEREFORE, PREMISES CONSIDERED, EOS requests that upon final trial, the Court grant EOS the following relief:

a.     Compensatory damages;

b.     Reasonable attorney's fees and costs of suit;

c.     Pre- and post-judgment interest to the fullest extent that applicable law permits; and

d.     Such additional relief, legal and equitable, to which EOS is justly entitled.

Dated: September 26, 2003
      Houston, Texas

                              Respectfully submitted,


                              _____
                              Harry P. Susman
                              SUSMAN GODFREY L.L.P.
                              1000 Louisiana Street, Suite 5100
                              Houston, Texas 77002-5096
                              Telephone:  (713) 651-9366
                              Fax:  (713) 654-6666

                              **ATTORNEY FOR PLAINTIFF**

Civil Cover Sheet

Page



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 19
The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein
neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use o
the Northern District of Illinois.

**Plaintiff(s): EOS Partners L.P., EOS Partners (Offshore), L.P.,**

County of Residence: New York

Plaintiff's Atty: Harry Susman
Susman Godfrey
1000 Louisiana, Suite 5100,
Houston Texas, 77002
713-653-7875

**Defendant(s):Madison Dearborn Partners Inc., Ma
Dearborn Partners LLC, Madison Dearborn Partn
III, L.P., Timothy Hurd, and Paul Wood**

County of Residence: Illinois

Defendant's Atty:

# 03C 6861

II. Basis of Jurisdiction: **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
(Diversity Cases Only)

Plaintiff:-N/A
Defendant:-N/A

*JUDGE MANNING*

MAGISTRATE JUDGE DEN

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **850 Securities / Commodities / Exchange**

VI.Cause of Action: **15 U.S.C. 78t (Section 20 of the Securities Exchange Act of 1934). This i
securities fraud case arising under the control person liability provision
Securities Act.**

VII. Requested in Complaint
Class Action: No
Dollar Demand: In excess of $1.5 million
Jury Demand: Yes

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: Harry Susman

Date: 9/26/03    9/29/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the Back button in your browser and change it. Once correct print this
form, sign and date it and submit it with your new civil action Note: **You may need to adjust the font size in your browser display to mak
the form print properly.** Revised: 06/28/00